## In re BARNEY BARKER.

*Habeas Corpus. Prisoner held on Void Warrant discharged.
Liquor Law. Common Informer. Warrant issued on
the Complaint of a Private Person is void.*

1. A warrant issued by a justice of the peace *on the complaint of a private
person*, under the statute regulating the sale of intoxicating liquor, is
void; and a prisoner arrested on such warrant and restrained of his
liberty by an officer may be discharged on *habeas corpus.*
2. The judge granting the writ will not discharge for errors which render a
proceeding voidable; but restraint upon process that is void is no
better than restraint without process.
3. A prisoner thus restrained by void process is not compelled to seek relief
through appeals in appellate courts, but is entitled to his discharge at
once.
4. R. L. ss. 3802, 3855, liquor law; 1344, *habeas corpus.*

HABEAS CORPUS. This case was tried in the County Court,
and by request of the bar is inserted here. Heard, March Term,
1883, VEAZEY, J., presiding. Complaint:

"That he is imprisoned and restrained by Roswell R. Mead, constable of
the town of Rutland, in the county of Rutland, and the cause or pretense of
such imprisonment and restraint is as hereinafter stated :

That your petitioner was arrested on the 28th day of March, 1883, by one D.
P. Peabody, sheriff, upon a warrant dated March 26, 1883, issued by one
Jewett P. Cain, a justice of the peace, and was held to bail by said justice in
the sum of $1,500 to answer to the complaint attached to said warrant: That
a copy of said complaint, warrant and recognizance, and the proceedings thereon,
is annexed hereto, from which it appears that the proceedings are an attempted
prosecution of your petitioner for selling intoxicating liquor contrary to law:
That a day was fixed by said Cain for your petitioner's so-called trial, which
day having arrived your petitioner was surrendered into court by his said bail,
and was thereupon committed by the said justice to the custody of the said
constable, who now imprisons and restrains him as aforesaid: That your
petitioner is advised and believes that said proceedings by which your peti-
tioner was arrested and held to bail and is now imprisoned and restrained, and
is being put to trial for said alleged offence are wholly illegal, nugatory and
void.

Wherefore your petitioner prays that a writ of *habeas corpus* may issue in
his favor forthwith to inquire into the cause of said imprisonment and
restraint, and that he may thereupon be relieved and discharged from the
same."                                                    [Signed.]

*In re* Barker.

The following records explain the arrest and detention of the relator.

"STATE OF VERMONT, }
RUTLAND, ss. }

To Jewett P. Cain, Esq., justice of the peace within and for the county of Rutland, comes Horace W. Love, of the town of Rutland, in the county of Rutland, and on oath complaint makes, that Barney Barker of Rutland, on the 26th day of March, A. D., 1883, at Rutland aforesaid, did at divers time, sell, furnish and give away intoxicating liquor, without authority, contrary to the form, force and effect of the statute in such case made and provided, and against the peace and dignity of the State.

HORACE W. LOVE."

"The above named Horace W. Love, of Rutland aforesaid, exhibited this complaint to me and made oath to the truth thereof this 26th day of March, A. D., 1883.

JEWETT P. CAIN,
Justice of the Peace."

"STATE OF VERMONT, }     TO ANY SHERIFF OR CONSTABLE IN
RUTLAND COUNTY, ss. }            THE STATE.

GREETING :

By authority of the State of Vermont, you are hereby commanded to apprehend the body of the said Barney Barker and him have forthwith before me at my office, 63 Center street, in said Rutland, that he may answer to the complaint hereto attached as by the said Horace W. Love, a private person, on oath in writing has been exhibited by him to me as aforesaid against the said Barney Barker and to be further dealt with according to law.

Given under my hand at Rutland aforesaid on the 26th day of March, A. D. 1883.

JEWETT P. CAIN,
Justice of the Peace."

"John B. Page, Chas. Sheldon and J. M. Haven, recognized with H. W. Love to the said Barney Barker, in the sum of twenty-five dollars, as surety that the said Horace W. Love, the prosecutor, shall prosecute said complaint to effect, or on failure thereof pay the costs adjudged to said Barney Barker.

Before me,
JEWETT P. CAIN,
Justice of the Peace."

"STATE OF VERMONT, }
RUTLAND COUNTY, ss. }     RUTLAND, MARCH 28, A. D. 1883.

Then by virtue of this warrant, I arrested the body of the within named Barney Barker and have him in court as therein commanded.

Attest,              D. P. PEABODY,
Sheriff."

"In Justice court, March 28, 1883, respondent appeared and case continued and adjourned to Tuesday, April 3, at nine o'clock A. M., at same place. The respondent, Barney Barker, as principal, and A. F. Walker as surety, appeared and became recognized to H. W. Love, common informer, and to the State in the sum of fifteen hundred dollars, conditioned that the respondent should appear April 3, and abide the order of the court.

JEWETT P. CAIN,
Justice of the Peace."

"In the Justice court, April 3, 1883, respondent Barney Barker appeared in court and was surrendered to the court by his surety, A. F. Walker, and committed to the custody of R. R. Mead, constable of the town of Rutland.

JEWETT P. CAIN,
Justice of the Peace."

Said Mead's return in effect was that the relator was placed in his custody by order of the said Cain, and that he was detained by him by virtue of said warrant and complaint.

*Prout & Walker*, for the relator.

*W. C. Dunton* and *James Barrett*, for Mead.

The opinion of the court was delivered by

VEAZEY, J. The relator was arrested upon a warrant of Jewett P. Cain, a justice of the peace, and was taken before him to answer (as stated in the warrant) " to the complaint herereto attached as by the said Horace W. Love, a private person, on oath in writing, has been exhibited by him to me as aforesaid against the said Barney Barker and to be further dealt with according to law." Having been thus arrested and brought before said justice, the latter placed the relator in the hands of the constable of the town of Rutland, who was the officer of said court, to whom this writ was directed, and who returns that the relator was in his custody " by virtue of said warrant and complaint."

The complaint was the statutory form provided in section 3859, Revised Laws, and therein prescribed to be the form for offenses against sec. 3802, Revised Laws, which section provides a penalty for the unlawful furnishing, selling or giving away of intoxicating liquor.

Mr. Love was not a town grand juror, but made this complaint as a private individual, and therefore struck out the words, " grand juror," found in the statutory form, and also the words importing that it was made upon the official oath of such officer; but swore to the complaint before the justice, and his jurat is appended to the complaint. This complaint and warrant with a recognizance to the relator " to prosecute said complaint to effect, or on failure thereof pay the costs adjudged to " the relator, constitute the process upon which he is held.

The relator claims that this process furnishes no justification for his arrest and detention, upon two grounds :

First, that he could not be lawfully arrested and put to trial before a justice of the peace for an offense against sec. 3802, Revised Laws, upon a complaint of a private person ; that this could only be done upon a complaint of a town grand juror or state's attorney, as provided in sec: 3803, Revised Laws;

Second, that there was no recognizance for damages as provided in sec. 1667, Revised Laws.

Counsel for the State deny that the relator can be discharged on either of these grounds ; they further deny, even if these positions are well taken, that a writ of *habeas corpus* is available to the relator ; and claim that the justice was authorized to issue such a warrant; that the arrest was justifiable on the warrant ; that the justice had jurisdiction both of the subject matter and the person ; that he had the relator before him and had the right to proceed and hear and determine every question that could be made as to the lawfulness of the proceeding ; that this court on this proceeding has no right to interfere with the justice court in its proceedings, but the relator must abide the decision there and take his remedy by appeal.

Sec. 1343, Revised Laws, provides : " No person's body shall be restrained or imprisoned, unless by authority of law."

Sec. 1344 : " A person imprisoned in a common jail or the liberties thereof, or otherwise restrained of his liberty by an officer or other person, may prosecute a writ of *habeas corpus* to inquire into the cause of such imprisonment or restraint, and obtain relief therefrom if it is unlawful."

These provisions are broad, broader than are found in some States; they confer a power and create a duty. Much might perhaps be said against conferring the power, especially upon single judges in vacation, on account of the danger that it might not be wisely exercised or might be abused ; but this pertains to the legislative department; and the policy of the State in that respect has been long established. We understand the limitation of the exercise of the power to discharge a relator in *habeas corpus* to be established by judicial decisions and practice in this State, so far as pertains to this case, substantially as it has

2

been elsewhere; and that is, that the court or judge granting the writ will not discharge for errors or irregularities which render a proceeding voidable; but will discharge for those radical defects appearing on the face of the process under which the relator is restrained, which render the proceeding absolutely void.

We do not overlook the principle essential to the efficient administration of justice, that where a court is vested with jurisdiction over the subject matter upon which it assumes to act, and *regularly obtains jurisdiction of the person*, it becomes its right and duty to determine every question which may arise in the cause, without any interference from any other tribunal. But we think that when the process shows that the jurisdiction of the person was illegally asserted, then jurisdiction of the person is not regularly obtained. Restraint upon process that is void is no better than restraint without process. There is in legal effect no process. The restraint is therefore in such case unlawful, and the statute, sec. 1364, says: "If no legal cause is shown for the imprisonment or restraint, the court or judge shall discharge the prisoner therefrom."

We do not think it would be warrantable under our statutes for the court or judge to say, when satisfied that the restraint is unlawful on account of the process being absolutely void, it is presumable that the court where this process is pending will decide correctly upon the lawfulness of the proceeding, and if adversely to the relator, though erroneous, he may appeal, and in due course, though perhaps after months of imprisonment, finally get relief in the appellate court. We think the statutes as they stand *impose* the duty upon courts acting upon a *habeas corpus* proceeding to discharge a prisoner when satisfied upon proper inquiry that he is unlawfully restrained. *Adams* v. *Whitcomb*, 46 Vt. 708; *Davis, ex parte*, 18 Vt. 401; *Tracy, ex parte*, 25 Vt. 93; Hurd, Hab. Cor., chap 6, sec. 2.

In *Greenough, ex parte*, 31 Vt. 279, Judge BENNETT used this language: "It is a well settled principle that a *habeas corpus* will not lie where the imprisonment is under voidable process, but only where the process is void. If the process is void it is

the same thing as if there were no process, and then the party in effect is imprisoned without any authority whatever ; and if in the case before us the executive of this State had no jurisdiction to issue his warrant the whole proceeding may be regarded as *coram non judice* and void, and Greenough should be discharged."

We think that *habeas corpus* is a proper remedy for the relator ; and that his right to be discharged must turn on the question of the character of the process upon which he is held.

Independently of the question raised as to the sufficiency of the recognizance, the validity of that process depends on the question whether Justice Cain had the legal right to issue his warrant on the complaint of a private person. The proceeding was instituted to recover the penalty provided in sec. 3802, Revised Laws. Was the process good or bad for this purpose, is the question. The question is not whether this method of enforcing the liquor law, so called, is wise or unwise ; it is not whether or not there is a general necessity, or a special necessity in this town to have the law enforced in this way in order to have it enforced ; but the question of necessity might bear somewhat on the construction of the statute here involved. It is not how a decision one way or the other will affect this community, or the politics of Rutland ; it is not what we or others think of the law as it stands, or desire as to its enforcement ; it is not what may be the right of an aggrieved person to have instituted a criminal proceeding on his own complaint to a magistrate or the right of a magistrate to issue a warrant on such complaint. The guilt or innocence of the relator, under the charge in the complaint, is not before us. The question is as to the right, under the law, to institute this proceeding in manner and form and for the purpose stated and hold this relator in restraint of his liberty under the process. This depends upon the construction to be given to chapter 169, Revised Laws, affected as it may be by other law, statute or common law.

I have been specific in stating what the question is and what it is not, in view of the somewhat wide range of the arguments.

*In re* Barker:

The original understanding of the official designation "justices of the peace" seems to have been that they were conservators of the peace. Before they had justices of the peace in England there were a class of officers known as conservators of the peace. In the reign of Edward III, an act of parliament ordained "that in every shire of the realm good men and lawful which were no maintainers of evil nor barrators in the county, should be assigned to keep the peace, ⁎ ⁎ ⁎ to repress all intention of uproar and force even in the first seed thereof and before that it should grow up to any offer of danger." Lambard book 1, ch. 4; 2 Hale, P. C., ch. 7, note 1. The real purpose of this act seems to have been to enable the king, Edward III, to appoint men upon whom he could rely in the different counties, to repress any effort of the people to release his father, Edward II, from prison. The only importance of this allusion here is to show that the official designation of these officers originally expressed the character and quality of the office, conservators of the peace. From this beginning additional power and authority has been given to justices of the peace, by acts of parliament from time to time. The office was introduced into this country by our forefathers with such functions and powers as existed under the English statutes. *Com. v. Foster*, 1 Mass. 489. But in this State the powers and duties have been so minutely regulated by statute, and the practice before justices here has become so well established we seldom have occasion to recur to the English statutes or practice; but this case is somewhat exceptional, and the extended discussion by counsel of the English statutes and practice has shed light on the question to be decided.

One ground upon which the counsel for the State base the validity of this process is that the complainant was a common informer. That is, that the statute having provided that a quarter of the fines, under sec. 3802, Revised Laws, should go to the complainant, when complaint is made, (sec. 3855, Revised Laws), any person has the right to institute a proceeding on his own complaint to a magistrate and prosecute the same.

*In re* Barker.

Espinasse on Penal Statutes, p. 5, after defining a penal statute, says : " The amount, the appropriation and the modes of suing for and recovering the penalties is to be collected from the statutes themselves. The statute which gives the penalty usually points out the mode of recovering it and the appropriation of it when recovered: The penalties are usually given to the party grieved ; to a common informer by the name of ' whosoever will sue for the same,' where the proceeding is by action ; to the king, or for some public purpose." And further along he says : " A statute which gives a certain penalty, to be recoverd by action ' by any person who will sue for the same,' and then gives part of the penalty when recovered to such person, and part to the king, poor of the parish, etc.; this is a *qui tam* or purely penal action. This person is usually termed a common informer, but which term is more properly appropriated to pro-ceedings by information, by which mode, also, penalties are recoverable." And again, page 18, he says : " There must be a proper informer or *qui tam* plaintiff; invested with legal power to sue. Actions purely *qui tam* or informations, not being given on account of any rights or claims residing in the parties suing, but being used by the Legislature only as means of enforcing the statute law ; all the rights of informers or *qui tam* plaintiffs must be derived from the statutes by which the penal-ties are given ; or, as said by Mr. Justice Lawrence (5 East. 315), a common informer cannot sue at common law. It is, therefore, necessary to show some clause in the act of parliament on which he sues, giving him power to sue in the particular case." Again, on page 57, he says : " But I find no authority to warrant a common informer to proceed by information, unless that mode of proceeding is expressly pointed out and directed by the statute."

Treating this complaint as an information, and sec. 3855, Revised Laws, as expressly pointing out and directing a proceed-ing by a common informer : First, can this complaint be sustained as a proceeding by a common informer ? There is no statement in it that the complainant prosecutes for himself as

well as the State. It is simply the statutory form of complaint prescribed for an informing officer. The form of prosecution by a common informer, as adopted and practiced in England, has been adopted and followed in this country, and contains the averment omitted in this complaint. See Chitty's Pleading ; 2 Swift Dig., p. 705 ; Burns' Justice, p. 456.

But a more important inquiry is this : Does sec. 3855, Revised Laws, expressly point out and direct a proceeding by a common informer ? The language is :  " One-fourth of the fines   *   *   *   shall go to the complainant."

Formerly we had many penal statutes appropriating a portion of the fine to a common informer or prosecutor, and the phraseology was the same in substance as found in all the English statutes, viz :  " to him who should prosecute the same to effect." As examples, see Vermont State papers, page 346, an act for the preservation of deer ; page 374, an act for the prevention and suppression of lotteries ; page 377, an act for the punishment of perjury ; page 382, an act to prevent the selling, etc., of untanned hides out of the State ; page 459, an act to restrain the taking of excessive usury.

We think it was not the intention of the Legislature, in sec. 3855, to limit the benefit to the complainant to cases that *he.* should prosecute, but to extend it to every person who should make the complaint and give the information that should lead to conviction, and whether the proceeding should be instituted in the County Court or before a justice. The object plainly was to secure a more vigorous enforcement of the law. The offense itself created no public disturbance, nothing to attract the attention of the prosecuting officers. In this respect it was unlike most other offenses. It was not an offense against an individual, like an assault, or larceny, or robbery, or arson. The person buying liquor would not feel aggrieved. In view of the peculiar character of this offense we think the Legislature intended by this section to offer inducements to people to disclose and inform of violations, and had no intention of imposing on the informer the burden of prosecution in order to entitle him to the benefit ;

because this would be likely to defeat all the advantage to be derived from the enactment. Few persons would undertake the burden of prosecution for the chance of the moiety, while many would be willing to give information of violations. In view of the form of enactment throughout our early statutes, and when the custom of giving a portion of the penalty to a prosecutor was so much more general than in later times, the omission of the ordinary provision is significant. But this construction is not conclusive here, because it may well be said that if a common informer can have a quarter of the fine by simply complaining to the prosecuting officer, he ought not to be deprived of it if he assumes the whole expense of prosecution. This will be involved in the discussion of the next point.

Another ground upon which the counsel for the State claim that this process is valid, is that any person may make complaint to a magistrate, and that such complaint under oath is justification for him to issue a warrant and proceed with the case. Counsel for the relator deny this except in case of the person " grieved " by the offense, and then only for the purpose of arrest and committal for trial. They also claim that, however that might be as to common law offenses, there is no such right under chapter 169, Revised Laws.

In Chitty's Criminal Law, the author says : " In general, however, every man is of common right entitled to prefer an accusation against a party whom he suspects to be guilty." To similar purport are other authorities. In *State Treasurer* v. *Rice* et al., 11 Vt. 339, WILLIAMS, Ch. J., in the opinion of the court, says : " The right of a private person to complain and prosecute for matters of a criminal nature has always been provided for " in this State. Without further suggestion on this point we pass to consideration of the construction of chapter 169, so far as pertains to the question here to be decided, which is the important consideration in the case.

Does the act provide a method of enforcement of the penalties provided in sec. 3802, exclusive of other methods ?

What was the intent in this respect as indicated by the language, and in the light of other legislation as to the prosecution of statutory offenses?

In the case above cited from the 11th Vt. Rep, Ch. J. WILLIAMS used this language: "There is a striking and important difference in prosecutions for criminal offenses here and in England. In this State, prosecutions for offenses before the County Court, which has original and exclusive jurisdiction of most offenses, are conducted by a public officer appointed for that purpose, and responsible for the manner in which he discharges his duty. In England they are usually instituted and conducted by private prosecutors, and, frequently, are only for the purpose of obtaining redress of a private injury. In many cases the civil action is suspended until the prosecution for the offense is terminated. Although private prosecutions are here recognized in some cases, yet they are unusual, and are not looked upon in a favorable view; and it is rare that the attention of the court has been called to proceedings under the section of the statute before mentioned, or to the authority of magistrates in such prosecutions."

This opinion was delivered in 1839. Prior to that time there had been numerous statutes providing that a moiety of the penalty should go to the person prosecuting, and prosecutions by private persons had been more frequent than they have been since, but had then grown into disfavor. Town grand jurors had been made general informing officers in their respective towns. This was done in 1801. In the revision of 1839 but little was saved of the early statutes giving a portion of the fine to the prosecutor. But there have always been a few such; and there are yet very few, thereby giving occasion for preserving the provisions with reference to recognizance for costs and damages as provided in secs. 1667 and 1749, Revised Laws, and for appeal, sec. 1674, where the prosecution is by other than an informing officer.

In this condition of the criminal statutes and practice to enforce them, the liquor act, so called, was passed in 1852, sub-

*In re* Barker.

stantially as it stands in the Revised Laws. Quite a number of additions have been made, but few alterations in other respects. It is matter of common knowledge that the act was much debated among the people and in the Legislature, and was carefully considered by lawyers and laymen. It was peculiar in many respects. It made an offense out of that which theretofore throughout the world had been considered as lawful, except as it had been then recently declared unlawful in Maine and perhaps a few other States. Its object was to suppress a general traffic on account of the injury to the community growing out of a general traffic and use of intoxicating liquor as a beverage. It provided a penalty for each act of selling, not because a single act was necessarily harmful, but because this seemed to be the only practicable way of suppressing the traffic and use. Instead of providing a penalty and leaving the enforcement, as in case of other offenses, to the ordinary processes and methods applicable without express provision, it expressly provided that the same " may be tried upon the complaint of the grand juror of the town, or the state's attorney, before a justice, or upon the information of the state's attorney, before the County Court," or upon indictment of the grand jury of the county. It provided a form of complaint or information instead of leaving it to be supplied from the common law precedents, as in case of most other crimes. It contains specific provisions to secure honesty and diligence on the part of the prosecuting officers. It has always been treated as peculiar in respect to matters of pleading. In *State* v. *Brown*, 36 Vt. 560, Barrett, J., says: " We do not feel called upon to enter very fully into the discussion of common law rules as applicable to the pleadings in criminal prosecutions. The Legislature has industriously endeavored to relieve the administration of the liquor law from questions of this character by enacting a code of procedure peculiar to this law."

This law is somewhat exceptional in other respects. Its completeness as a code upon the subject matter is conspicuous. It conferred extraordinary power upon justices, conservators of the peace, in respect to an offense not in itself a breach of the peace.

There were then probably hundreds and even thousands of people who dealt in liquor as a lawful, and not then so generally considered, as now, an immoral traffic. We think there were then good reasons why the Legislature should think that the enforcement of this law should be kept in the hands of the sworn officers of the law, to be elected by the people, and not imperil it by allowing it to become an instrument of persecution to be used by any individual simply as such and without any good motive. All the reasons to this end *then* might not apply *now*. But, however the case would otherwise stand, we think the well established rule applies in this case, that when the statute creates a new offense, and makes that unlawful which was lawful before, and prescribes a particular penalty and mode of proceeding, that particular mode must be pursued, and not others. Pott. Dwarris on Statutes, p. 162; *The People* v. *Hislop*, 77 N. Y., 331. Russell in his treatise on crimes, vol. 1, p. 50 (8 Am. ed.), says, the true rule is as follows: " Where the offense was punishable by a common law proceeding, before the passing of a statute which prescribes a particular remedy by a summary proceeding, then either method may be pursued as the particular remedy is cumulative, and does not exclude the common law punishment; but where the statute creates a new offense by prohibiting and making unlawful anything which was lawful before, and appoints a particular remedy against such new offense by a particular sanction and particular method of proceeding, such method of proceeding must be pursued, and no other."

This language was taken from the opinion of Lord MANSFIELD in *Rex* v. *Robinson*, 2 Burr. 803. This rule rests on the maxim that the express mention of one thing excludes all other things.

In some early English cases a distinction was made, that where the offense is created in one section and penalties are prescribed in a subsequent section, the subsequent one is cumulative, and the common law method may be followed.

Bishop in his work on statutory crimes, sec. 251, speaks of this as refined and technical and against reason. No American

authority has been produced where it was regarded as substantial. But if it were, it would not apply to this case; because this proceeding was instituted to recover the penalty prescribed in sec. 3802, Revised Laws, not for the misdemeanor, if any, created by the prohibition in sec. 3800.

The word " may " in the clause " may be tried," in section 3803, cannot strictly be said to mean " must " or " shall ;" because neither of those words are applicable, but it is no less imperative than either of those words. would be. The section begins by saying justices " shall have concurrent jurisdiction," etc., and then proceeds to say how they may, that is, can, proceed. No other word could properly be used there.

In view of the above, we do not think that sec. 3855, providing for a distribution of the fine, operated to change the statute as to methods of procedure for the sale or furnishing of intoxicating liquor. That was passed in 1869, and we think from the language used, and omitted to be used, its purpose was to increase the inducements to promote prosecutions, by the methods first provided. To go beyond this seems to us would be legislation practically, instead of construction. The only claimed advantage of the enlarged construction insisted upon, is based upon the assumption that the constituted prosecuting officers will not discharge their duty. When this appears the Legislature can supply the remedy. We think they have not done it yet, therefore the court cannot rightfully do it.

The result is, no legal cause is shown for the restraint of the relator, and he is discharged.